IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CLIFFORD BRODSKY,<br><br>        Petitioner,<br><br>    v.<br><br>ANTHONY P. KANE,<br><br>        Respondent.                                    / | No. C 06-02288 CRB<br><br>**ORDER DENYING PETITION<br>FOR A WRIT OF HABEAS CORPUS** |

    Petitioner Clifford Brodsky, a state prisoner incarcerated at the Correctional Training Facility in Soledad, California, seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254. He challenges the constitutionality of a November 19, 2003, decision by the Board of Prison Terms ("BPT") to deny him parole. For the reasons set forth below, the petition is DENIED.

## BACKGROUND

    In 1989, Petitioner participated in a conspiracy to murder an associate, Robert Krugman, who had failed to repay a business debt. With the assistance of four to five other accomplices, Petitioner concocted a scheme to hire two "hitmen" to murder Krugman. Petitioner and his accomplices stood to gain approximately $1.25 million from an insurance policy they had obtained on Krugman's life. The scheme was foiled when a security guard from Petitioner's business notified the Los Angeles Police Department, which disrupted the plot and intercepted the hitmen prior to the murder. In 1991, Petitioner entered a plea of no

1  contest to a charge of conspiracy to commit second-degree murder, and he received a
2  sentence of 15 years to life.  Pursuant to a plea agreement, the prosecutor agreed not to
3  oppose Petitioner's release when he became eligible for parole, provided that Petitioner
4  remain free of disciplinary problems while incarcerated and cause no violence to befall any
5  of the state's witnesses who might have testified against him.

6  Due to credits for his exemplary behavior during incarceration, Petitioner became
7  eligible for parole before he had served 15 full years.  Nonetheless, the BPT twice has
8  declined to set a release date for him, first at a hearing in December of 2001 (which was not
9  resolved until September of 2002), and again at a hearing November of 2003.  Here,
10 Petitioner challenges the BPT's denial of parole at his second hearing.

11 At that hearing, the BPT denied parole for one year, concluding that Petitioner would
12 pose "an unreasonable risk of danger to society or a threat to public safety if released from
13 prison."  Pet. Appx. A, Ex. E, at 57.  In so concluding, the BPT relied almost exclusively
14 upon the commitment offense, which it described as "especially coldhearted" and "carried
15 out in a dispassionate and calculated manner" with "disregard for the suffering of another
16 human being."  Id.  The BPT described the motive for the crime as "trivial and inexplicable."
17 Id.  The BPT noted that the district attorney made no statement in opposition to Petitioner's
18 release, but it also observed that the intended victim's family had written "heart-wrenching"
19 letters in opposition to parole.  Id. at 58-59.

20 The BPT acknowledged Petitioner's exemplary prison record, including his
21 participation in rehabilitative programs and the lack of any disciplinary infractions.  Id. at 59.
22 It also recognized that Petitioner's background gave no indication that he would be
23 dangerous--Petitioner has no prior criminal history, has a strong educational background, has
24 the support of his family, and has plans upon his release, including a job offer.  Id. at 58-59.
25 The BPT also noted a psychological report indicating that, upon release, Petitioner would
26 pose "no more" of a potential for violence than "the average citizen in the community."  Id.
27 at 58.  Despite his considerable progress, the BPT concluded that Petitioner was still
28 unsuitable for release because "those positive aspects of . . . his behavior does [sic] not

outweigh the factors of unsuitability," referring once again to the circumstances of the crime and its impact on the intended victims. Id. at 59-60. The BPT concluded the hearing by encouraging Petitioner that he needed to "continue in the positive program that you're on, continue on the track that you're on, continue to participate in whatever types of programs that may be available to you, whether it's self-help or reading books or other types of--other types of activity that would give you insight into the crime and help you be able to face stressful situations on the outside in a nondestructive manner." Id. at 60. Finally, the BPT requested a new psychological evaluation to examine "the prisoner's violence potential in the free community." Id.

Petitioner timely, but unsuccessfully, sought a petition for writ of habeas corpus in Los Angeles County Superior Court. He unsuccessfully appealed his case to both the California Court of Appeal and the California Supreme Court. The instant petition followed.

## STANDARD OF REVIEW

This Court may entertain a petition for a writ of habeas corpus under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

The petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or ( 2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Id. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 412-13 (2000). "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court

1  identifies the correct governing legal principle from [the] Court's decisions but unreasonably
2  applies that principle to the facts of the prisoner's case." Id. at 413.

3  "[A] federal habeas court may not issue the writ simply because that court concludes
4  in its independent judgment that the relevant state-court decision applied clearly established
5  federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."
6  Id. at 411.  A federal habeas court making the "unreasonable application" inquiry should ask
7  whether the state Court's application of clearly established federal law was "objectively
8  unreasonable." Id. at 409.

9  The only definitive source of clearly established federal law under 28 U.S.C. §
10 2254(d) is in the holdings (as opposed to the dicta) of the Supreme Court as of the time of the
11 state court decision.  See id. at 412; Clark v. Murphy, 331 F.3d 1062, 1069 (9th Cir. 2003).
12 While circuit law may be "persuasive authority" for purposes of determining whether a state
13 court decision is an unreasonable application of Supreme Court precedent, only the Supreme
14 Court's holdings are binding on the state courts and only those holdings need be
15 "reasonably" applied.  Clark, 331 F.3d at 1069.

## DISCUSSION

17 Petitioner advances three central claims in support of his petition.  First, he argues that
18 the BPT's denial of parole violated the terms of his plea agreement.  Second, he argues that
19 the district attorney's conduct at the parole hearing constituted a violation of the terms of his
20 plea agreement.  Third, Petitioner claims that the BPT's ruling did not comport with the Due
21 Process Clause.

### I.  BPT's Compliance with the Plea Agreement

23 Petitioner first argues that the terms of his plea agreement required his release after 10
24 years of incarceration.  He claims that the prosecutor guaranteed he would serve no more
25 than 10 years as long as he remained free from discipline and he caused no harm to befall any
26 of the state's witnesses who would have testified against him.  Petitioner alleges that he has
27 remained discipline-free and that he has caused no harm to befall any of the state's witnesses;
28 therefore, he contends that he has upheld his end of the bargain.  He argues that the BPT's

4

1  decision to deny parole violates the guarantee of release provided by his plea agreement. See
2  Santobello v. New York, 404 U.S. 257, 262 (1971) ("[W]hen a plea rests in any significant
3  degree on a promise or agreement of the prosecutor, so that it can be said to be part of the
4  inducement or consideration, such promise must be fulfilled.").

5  The record, however, provides little support for Petitioner's theory.  Simply put, there
6  is no evidence in the record to suggest that his plea agreement incorporated a guarantee of
7  release after 10 years.  The only evidence cited by Petitioner is the plea colloquy itself, at
8  which time the district attorney made the following statement:

> I have offered to counsel and his client that the defendant enter a plea to the count as charged with a stipulation by the People that this would be conspiracy to commit murder of the second degree, which would entail *a sentence of 15 years to life* in state prison rather than 25 to life as contemplated by the present charge.
>
> I have indicated a couple of other things to counsel. . . . In addition, I have told [defense counsel], and I believe he has represented to his client, that on behalf of the District Attorney's Office my estimation of this case as [a] trial lawyer would be that *when the Board of Prison Terms sees fit to parole Mr. Brodsky I would agree with that determination, and that I would have no opposition to Mr. Brodsky being paroled at the first date that the Board of Prison Terms determines to be suitable.*
>
> That would be contingent on a couple of things One, that Mr. Brodsky remain discipline free while within the Department of Corrections. Secondly, that no violence occurs to any of the People's witnesses or potential witnesses that are presently involved with the case.
>
> And I further represented to [defense counsel] that I'll place a memo in my file so that some years hence when a district attorney, if not myself, attends that lifer hearing, that this disposition as represented by the record is known and in the file and can be represented to the appropriate authorities at that time.

21  Pet. Appx., Ex. F, at 14-15 (emphasis added).  Upon this explanation of the plea agreement
22  by the prosecutor, the trial court judge then asked Petitioner whether he understood that his
23  guilty plea entailed a sentence of "15 years to life in the state prison," and Petition affirmed
24  that he did.  Id. at 17.

25  On this record, there is no reasonable basis for Petitioner to have concluded that his
26  plea agreement carried a guarantee that he would be released after 10 years.  To begin, the
27  sentence imposed was "15 years to life in state prison," the obvious meaning of which is that
28  Petitioner would remain in custody for an indeterminate period of time, but not *less* than 15

5

1 years, less appropriate credits.  Further, it is evident from the prosecutor's colloquy that he
2 was not promising a release date.  His language clearly indicates that a decision about
3 Petitioner's suitability for parole would rest, as it does in all cases, with the BPT.  The
4 prosecutor's promises extended only to the district attorney's own participation in parole
5 proceedings; they did not guarantee an outcome of those proceedings.  See, e.g., id. at 14
6 ("[W]hen the Board of Prison Terms sees fit to parole Mr. Brodsky I would agree with that
7 determination, and . . . I would have no opposition to Mr. Brodsky being paroled at the first
8 date that the Board of Prison Terms determines to be suitable.").

9      The fact that Petitioner now claims to have construed the prosecutor's statements as a
10 promise of release does not entitle him to habeas relief, nor even to an evidentiary hearing.
11 Too, the Court finds unpersuasive the flip-side of Petitioner's argument--that, because his
12 plea agreement actually does not require his immediate release upon eligibility for parole, he
13 did not knowingly and voluntarily enter into his plea agreement.  See, e.g., Boykin v.
14 Alabama, 395 U.S. 238, 242 (1969).  A plea agreement must be measured by objective
15 contract law standards, which examine the *reasonableness* of a criminal defendant's
16 understanding of the plea.  See Brown v. Poole, 337 F.3d 1155, 1159 (9th Cir. 2003).  Here,
17 Petitioner can point to no basis in the record to support a *reasonable* inference that his plea
18 agreement carried a guarantee of release after 10 years.  To the contrary, the record suggests
19 that Petitioner received a run-of-the-mill indeterminate sentence of 15-to-life, albeit with a
20 promise that the prosecutor would not oppose his release during parole proceedings.  In
21 contrast to the cases cited by Petitioner, the record in this case contains no indication the he
22 ever received an affirmative, or even an ambiguous, assurance that he would be released at a
23 certain point in time.  See Buckley v. Terhune, 441 F.3d 688, 691-98 (9th Cir. 2006)
24 (construing a written agreement in defendant's favor where one paragraph stated that he
25 would serve a "maximum of fifteen years" while another paragraph stated "fifteen to life");
26 Brown, 337 F.3d at 1158-62 (9th Cir. 2003) (finding that the prosecutor had breached a
27 promise, made on the record, that the defendant would "get out in half the time" if he
28 "behave[d] [himself] at the state prison").

6

In considering Petitioner's claim, the California Court of Appeal described Petitioner's theory "that his plea agreement contemplated he would be paroled at the expiration of the minimum term" as "contrary to the record of the trial court proceedings." Pet. Appx., Ex. N, at 2. In other words, the California court concluded that, contrary to Petitioner's theory, his plea agreement contained no guarantee of release upon eligibility for parole. For the reasons set forth above, this Court cannot conclude that the California court's ruling "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). Nor, given the California court's reasonable construction of the plea, can this Court conclude that the state court's denial of habeas relief "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." Id. § 2254(d)(1). Accordingly, the Court cannot grant the petition on this ground.

## II. District Attorney's Compliance with the Plea Agreement

At the challenged parole hearing, a representative from the Los Angeles County District Attorney's office attended and participated in the proceedings. Toward the end of the hearing, he attempted to pose a question about whether it was true that Petitioner had "orchestrated" the plot or whether Petitioner still considered himself as "simply an equal with three others" who participated in the conspiracy. Pet. Appx., Ex. E, at 38, 43. Petitioner's counsel objected to the question as an attempt by the prosecutor to "over-characterize the offense in order to achieve a finding of unsuitability," and he instructed Petitioner not to answer it. Id. at 39. The district attorney then stated:

> Thank you. I have reviewed very carefully the memorandum by [the original prosecutor]. In it he indicated that we would not be opposing parole, and I have not made any such statement of opposition nor do I intend to. However, that statement and the plea agreement certainly does not bind any representative from the District Attorney's Office from asking questions through the Panel. That is very clear in and of itself. And I believe that certain questions may be asked by the District Attorney's representative to the Chairman if the prisoner is being candid today. That has nothing to do with whether we believe he's caused any harm or whether he's been disciplinary free. . . .
>
> . . .

7

> Yes. The District Attorney's Office has entered in a plea agreement with counsel through Mr. Hodgeman at the time of his sentencing. We will abide by that plea agreement, reluctantly on my part personally, but we will abide by that agreement. We will submit it. I would, however take -- ask the Panel to take not that the inmate indicated he would answer questions at the beginning of today's hearing but chose not to on this particular question. I would also submit to the Panel that this question is essentially similar to one that was asked by Commissioner Munoz last year at the panel. Submitted.

Pet. Appx., Ex. E, at 41-42, 44-45. In setting forth its decision, the BPT explicitly noted that "in opposition to a finding of suitability the District Attorney did not make a statement in opposition, one way or the other." Id. at 58-59.

Petitioner argues that the district attorney breached the terms of the plea agreement. He notes that, at the time of his change-of-plea hearing, the prosecutor explicitly promised not to oppose Petitioner's release on parole as long as he remained free from discipline and caused no harm to befall any of the state's witnesses who would have testified against him. Petitioner contends that he upheld his end of the bargain, but that the district attorney's office nonetheless undermined the possibility of release at the parole hearing, in violation of its contractual obligations. Petitioner argues that these representative's statements constituted a breach of the district attorney's promise that his office would "have no opposition to Mr. Brodsky being paroled at the first date that the Board of Prison Terms determines to be suitable." Pet. Appx., Ex. F, at 14-15.

It is certainly true that the district attorney's office failed to offer its unmitigated and enthusiastic support for Petitioner's release. And it is also true that the representative from the district attorney's office suggested that he, personally, was reluctant to abide by the office's commitment not to oppose release. Thus, the conduct of the district attorney's representative at the parole proceeding arguably communicated to the BPT that it had only grudgingly withheld its opposition to parole. Nonetheless, there is also ample evidence in the record to support the view that no breach of the plea agreement occurred. To begin, the prosecutor explicitly stated, twice, that he was not opposing parole. Pet. Appx., Ex. E, at 41 ("[The prosecutor] indicated that we would not be opposing parole, and I have not made any such statement of opposition nor do I intend to."); id. at 44 ("We will abide by that agreement, reluctantly on my part personally, but we will abide by that agreement. We will

8

submit it."). Moreover, and more importantly, in rendering its decision, the BPT explicitly noted its understanding that "the District Attorney did not make a statement in opposition, one way or the other." Id. at 58-59.

On this record, the California Court of Appeal found that no breach of the plea agreement had occurred. Pet. Appx., Ex. N, at 2. Given the prosecutor's two explicit statements that he would not make any statement in opposition to parole, this Court cannot conclude that the California court's decision was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). Moreover, even if the Court were to credit Petitioner's view that the district attorney's statements constituted a breach of the plea agreement, such a breach still would not entitle Petitioner to habeas relief. Given the BPT's statement that the district attorney had made no statement in opposition "one way or the other," the record indicates that prosecutor's statements did not influence the BPT's finding that Petitioner was unsuitable for release. Because the record indicates that Petitioner suffered no prejudice from the prosecutor's purported breach, the Court cannot conclude that the state court's denial of relief was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). Petitioner cites to no clearly established Supreme Court authority for the proposition that an inconsequential breach of the plea agreement--which, again, did not occur under the California court's reasonable determination of the facts--would warrant his release from prison. The breach identified by the Petitioner in this case differs markedly from those in other habeas cases where the repudiation of a plea agreement deprived the prisoner of a contractual right to be released. See Buckley, 441 F.3d at 691-98 (granting habeas relief where the plea agreement conferred a right to be released after a "maximum of fifteen years"); Brown, 337 F.3d at 1158-62 (9th Cir. 2003) (granting habeas relief where the prosecutor had made a promise that the defendant would "get out in half the time"). For this reason, too, the Court finds that federal habeas relief is unwarranted on the basis of the prosecutor's conduct.

### III. Due Process Claims

Petitioner next argues that the BPT's decision to deny parole violated the Due Process Clause. He argues that the BPT's ruling was unsupported by "some" evidence and that the BPT thereby deprived him of a federally protected liberty interest created by California's parole regime.

"There is no constitutional or inherent right of a convicted person to be conditionally released before the expiration of a valid sentence." Greenholtz v. Inmates of Nebraska Penal and Corr. Complex, 442 U.S. 1, 7 (1979). Yet a State "create[s] a liberty interest protected by due process guarantees" when its parole scheme employs "statutory language [that] itself creates a protectible expectation of parole." Id. at 11-12.

In California, the Penal Code provides that "prior to [an] inmate's minimum eligible parole release date a panel of two or more commissioners or deputy commissioners shall again meet with the inmate *and shall normally set a parole release date*." Cal. Penal Code § 3041(a). Citing this mandatory statutory language, the Ninth Circuit has repeatedly held that "California's parole scheme gives rise to a cognizable liberty interest in release on parole." McQuillion v. Duncan, 306 F.3d 895, 903 (9th Cir. 2002); see also Irons v. Carey, 479 F.3d 658, 662 (9th Cir. 2007); Sass v. Cal. Bd. of Prison Terms, 461 F.3d 1123, 1128 (9th Cir. 2006); Biggs v. Terhune, 334 F.3d 910, 914 (9th Cir. 2003). Thus, the BPT's decision to deny parole cannot stand unless it is supported by "some evidence," a "minimal standard" designed to ensure that "'the record is not so devoid of evidence that the findings of the disciplinary board were without support or otherwise arbitrary.'" Sass, 461 F.3d at 1128-29 (quoting Superintendent v. Hill, 472 U.S. 445, 457 (1985)). The "some evidence" standard is "clearly established" under Supreme Court precedent and is therefore applicable under AEDPA to decisions rendered by the BPT. Id. at 1129.

Here, the BPT discussed only a couple of considerations in justifying its decision to deny parole. First, the BPT's decision hinted that Petitioner may pose a threat of violence to the community upon his release. It suggested that Petitioner should "continue to participate in whatever types of programs that may be available to [him], whether it's self-help or

10

reading books or other types of . . . activity that would give [him] insight into the crime and help [him] be able to face stressful situations on the outside in a nondestructive manner." Pet. Appx., Ex. E, at 60. The BPT further requested a "new psychological evaluation" to analyze "the prisoner's violence potential in the free community." Id.

To the extent that the BPT based its decision on its perception that Petitioner's psychological condition makes him a threat to society, this justification is utterly without support. Indeed, the evidence in the record clearly indicates otherwise. Petitioner has had a discipline-free term of incarceration, without even a single infraction. Indeed, his prison record is exemplary--he has participated in self-help and therapy classes, has worked as a teaching assistant, and has completed numerous vocational classes. See id. at 19-20. Petitioner's testimony at the parole hearing also suggests a sophisticated understanding of the impulses that drove him to commit the crime for which he has been incarcerated. See, e.g., id. at 37 (describing how the circumstances of imprisonment have forced him to manage the competitive tendencies and rigid thinking that contributed to the commission of the crime); id. at 11-12 (describing how he has learned to control his anger during his confinement and how he has come to understand the type of anger that led him to commit the crime). A senior psychologist at the correctional facility has stated that Petitioner demonstrated "very good insight into his commitment offense" and "appropriate and genuine remorse for this crime." Id. at 22. His supervisors and counselors describe him as "exceptional in all areas of attitude toward fellow inmates and workers," id. at 20, and as posing "a low degree of threat to the public at this time if release from prison," id. at 22. A psychologist's report concluded that Petitioner was "an excellent candidate for parole" whose potential for violence is "estimated to be no more than the average citizen in the community." Id. at 23-24. In short, the BPT's suggestion that Petitioner requires further psychological evaluation to assess the danger he poses to the public is without any foundation in the record at all.

The only other justification provided by the BPT for its decision is the nature of the crime of conviction--along with the consequences of that crime, as described by the intended victim, Robert Krugman, and his family. See id. at 59 (noting the presence of the victims at

11

the parole hearing, and observing that their testimony and the letters of others had "voiced strong opposition to a finding of suitability"). The BPT stated that "the motive for the crime was trivial and inexplicable." Id. at 57. It described the crime as "especially coldhearted," as as "carried out in a manner that demonstrated a disregard for the suffering of another human being," and as "carried out in a dispassionate and calculated manner." Id. at 57.

Petitioner contends that the BPT's reliance on the immutable facts of the attempted murder-for-hire constitutes a violation of the Due Process Clause. This argument invokes a constitutional right whose contours remain somewhat murky under Ninth Circuit law. In Biggs v. Terhune, the Ninth Circuit held that "continued reliance in the future on an unchanging factor, the circumstance of the offense and conduct prior to imprisonment, runs contrary to the rehabilitative goals espoused by the prison system and *could* result in a due process violation." 334 F.3d at 917 (emphasis added). Subsequent to Biggs, however, the Ninth Circuit has twice rejected claims that the BPT's denial of parole based on the unchanging facts of the prisoner's commitment offense runs afoul of the Due Process Clause. See Irons, 479 F.3d at 664-65 ("Because we find that Irons' crime was similarly cruel or vicious, we cannot say that there was not 'some evidence' to support the Board's determination that Irons was unsuitable for parole under California law."); Sass, 461 F.3d at 1129 ("The evidence of Sass' prior offenses and the gravity of his convicted offenses constitute some evidence to support the Board's decision."). This Court is aware of no published Ninth Circuit decision that has granted habeas relief under AEDPA based on the BPT's "continued reliance" of a prisoner's conviction offense, though certain district courts, including this one, *have* granted relief on this basis. See, e.g., Rosenkrantz v. Marshall, 444 F.Supp.2d 1063 (C.D. Cal. 2006); Brown v. Kane, 2007 WL 1288448, No. C 05-5188 CRB (N.D. Cal. May 2, 2007) (Breyer, J.).

The Court finds that this case presents a close question about whether habeas relief is appropriate. On the one hand, many of the BPT's findings about the crime are even contradicted by the record. For instance, the BPT described the motive for the crime as "trivial and inexplicable." Pet. Appx., Ex. E, at 57. Yet the motive for the crime was neither

12

1  of these things: its purpose was to obtain $1.25 million dollars from the proceeds of an
2  insurance policy in order to recoup an unpaid debt.  Of course, the desire to recoup $1.25
3  million in insurance proceeds is not an adequate reason to take a life, and this explanation
4  obviously does not provide Petitioner with a legal defense to his crime.  Yet neither can it
5  possibly be said that his motive in committing the crime was trivial or inexplicable, as those
6  terms are defined under California criminal law.  See Cal. Code Regs. tit. 15, §
7  2042(c)(1)(E); In re Scott, 119 Cal. App. 4th 871, 892-93 (2004) ("An "inexplicable" motive,
8  as we understand it, is one that is unexplained or unintelligible, as where the commitment
9  offense does not appear to be related to the conduct of the victim and has no other discernible
10 purpose. A person whose motive for a criminal act cannot be explained or is unintelligible is
11 therefore unusually unpredictable and dangerous.").
12         Similarly, the Court is unmoved by BPT's description of the intended murder-for-hire
13 as "coldhearted" and as "carried out in a manner that demonstrated a disregard for the
14 suffering of another human being."  Pet. Appx., Ex. E, at 57.  All crimes in which the
15 perpetrator intends to take the life of another involve some degree of callousness for the loss
16 of life or the suffering of the intended victim.  The California Penal Code nonetheless
17 provides that such offenders "shall normally [receive] a parole release date," absent
18 exceptional circumstances.  Cal. Penal Code § 3041(a).  In this case, *the murder was never*
19 *carried out*.  It is therefore impossible to conclude, as the BPT did, that the execution of the
20 crime involved an exceptional degree of callousness or disregard for human suffering.
21 Certainly, there is nothing in the record to suggest that Petitioner's scheme involved a degree
22 of callousness, coldheartedness, or indifference to suffering that might set it apart from other
23 schemes with the same ultimate objective.  See, e.g., In re Dannenberg, 34 Cal.4th 1061,
24 1069 (2005) (approving the denial of parole based on the viciousness of the crime where the
25 prisoner "beat [his wife] with a pipe wrench during a domestic argument" and then "while
26 she was helpless from the beating, . . . placed or forced her head under water, or at least
27 allowed it to remain there, until she died"); In re Van Houten, 116 Cal.App.4th 339, 351
28 (2004) (describing the special circumstances that must exist to deny parole on the basis of the

13

perpetrator's callousness or brutality). Nothing in the record suggests that this case involves any such brutality or callousness, either in the details of Petitioner's scheme, as to which the record provides almost no details at all, or in the execution of the crime, which was thwarted. For this reason, the "coldheartedness" perceived by the BPT does not distinguish Petitioner's crime in a manner that would support its decision to deny parole.

Finally, the BPT suggested that Petitioner was unsuitable for parole because the conviction offense was "carried out in a dispassionate and calculated manner." As to this reason for denying parole, the Court concludes that it constitutes "some evidence" to support the BPT's reasoning. Petitioner positioned himself as the beneficiary of a $1.25 million insurance policy on the life of business associate, and he then developed and set into motion a scheme whereby two assassins were hired to murder the insured. The Court is satisfied that the circumstances of Petitioner's crime thus constitute "some evidence" that the conspiracy offense "was carried out in a dispassionate and calculated manner." Cal. Code Regs. tit. 15, § 2042(c)(1)(B). The Court has considered the objections presented by Petitioner to this finding--including his view that the BPT's assessment of the crime involved impermissible judicial factfinding, and his argument that the BPT's reliance on certain facts relating to the crime was a violation of the plea agreement--and finds them to be without merit.[1] The

---

[1] Petitioner has submitted 192 pages of written analysis in support of his petition, including a 104-page opening brief and a 35-page reply brief. Chiefly, these materials analyze California's parole system and make observations, both legal and political, about what Petitioner views as the defective and unconstitutional operation of the system. Two of these observations warrant a response by the Court.

First, Petitioner suggests that the BPT's decision to deny parole violated the Sixth Amendment, insofar as the BPT made additional findings of fact about the underlying crime to justify its decision. Petitioner argues that such factfinding runs afoul of the Supreme Court's decisions in Apprendi v New Jersey, 530 U.S. 466 (2000); Blakely v Washington, 542 U.S. 296 (2004); and United States v. Booker, 543 U.S. 220 (2005). This argument is unpersuasive. Even assuming that those Sixth Amendment cases are pertinent in the parole context, the BPT did no impermissible factfinding about Petitioner's crime. It merely characterized the commitment offense based on facts already admitted -- admissions that exist by virtue of Petitioner's plea, as well as his colloquy with the BPT at his parole hearing. The Sixth Amendment does not prohibit drawing conclusions from a criminal defendant's own admissions. Booker, 543 U.S. at 244. Moreover, Petitioner cites no authority, much less clearly established Supreme Court precedent, to support the proposition that the Apprendi-Blakely-Booker cases have any bearing on parole proceedings. This Court finds it difficult even to imagine how such cases even *could* be applied in a context that presupposes additional factfinding. After all, it is the duty of parole

1  Court's finding that "some evidence" exists to support the BPT's ruling is informed by the

2  fact that "the [BPT's] decision was made before [Petitioner] had served the minimum number

3  of years required by his sentence." Irons, 479 F.3d at 665; see also id. ("All we held in

4  [Biggs and Sass] and all we hold today . . . is that, given the particular circumstances of the

5  offenses in these cases, due process was not violated when these prisoners were deemed

---

boards to find facts--about the crime, the prisoner's disciplinary record, the prospects of rehabilitation--in order to determine whether parole is appropriate. In fact, the BPT's authority to find facts is implicit in the fact that courts review the BPT's decisions to ensure that they are supported by "some evidence." Nor has Petitioner pointed to any clearly established Supreme Court authority to support his contention that the parole authorities somehow lose authority to rely on the admitted circumstances of the crime simply because a plea agreement exists--the benefit of which is evident in Petitioner's very eligibility for parole. No case cited by Petitioner suggests that a defendant's decision to enter into a plea agreement for a lesser crime restricts the parole board in this manner.

Second, Petitioner suggests that parole proceedings in California are governed by unconstitutionally vague concepts. He notes that under California law the BPT may deny parole based on the unchanging circumstances of the commitment offense so long as it can "point to factors beyond the minimum elements of the crime for which the inmate was committed." In re Dannenberg, 34 Cal. 4th 1061, 1071 (2006). He contends that this vacuous standard is so vague as to be unworkable, especially in cases involving plea agreements, where the circumstances of the crime are almost always, by definition, "beyond the minimum elements" of the commitment offense. Petitioner notes that this case serves as a particularly good example of this dysfunction, given that Petitioner pled to second-degree murder (a crime that by definition involves no premeditation) and yet is being detained on the basis of first-degree facts, such as the fact that his crime involved a murder-for-hire and was "carried out in a dispassionate and calculated manner." Pet. Appx., Ex. E, at 57.

Petitioner's criticism of the California parole system is not without force. Unfortunately for him, it provides no basis for issuing a writ of habeas corpus in this case. No Ninth Circuit or Supreme Court case has ever suggested, much less clearly established, that the standards for granting or denying parole, as opposed to the standards for imposing criminal sanctions in the first place, must be sufficiently specific or clear. Nor is there any controlling authority to support his argument that the BPT (as opposed to the sentencing judge) is precluded from making factual findings about a crime by virtue of a plea agreement. If anything, it appears that the law is to the contrary--given that "[t]here is no constitutional or inherent right of a convicted person to be conditionally released before the expiration of a valid sentence," Greenholtz, 442 U.S. at 7, it would appear that the State of California has unbridled discretion in determining the standard by which to grant parole, if at all. The Ninth Circuit decisions recognize California's authority in this matter by relying upon Dannenberg, in part, as setting forth the decision-making standard for which "some evidence" must be found. See, e.g., Irons, 479 F.3d at 663 (citing Dannenberg, 34 Cal. 4th at 1071). Finally, even if this Court were to accept the unprecedented argument that a *judicial opinion* by the California Supreme Court could render California's statutory and regulatory parole scheme constitutionally deficient, that deficiency would have no bearing on this case; this Court concludes that "some evidence" would still support the BPT's ultimate determination "that consideration of the public safety requires a more lengthy period of incarceration for [Petitioner]." Cal. Penal Code § 3041(b). To the extent that Petitioner contends the BPT and the California courts misapplied the statutes and regulations governing parole proceedings--a contention with which this Court disagrees--the misapplication of state law does not provide a basis for federal habeas relief. 28 U.S.C. § 2254.

unsuitable for parole prior to the expiration of their minimum terms."). The Court reaches no conclusion about whether the unchanging facts of Petitioner's crime would be sufficient to sustain the denial of a release date at any future parole hearing. Sass, 461 F.3d at 1129 ("[I]t is not our function to speculate about how future parole hearings could proceed").

## CONCLUSION

The Court emphasizes the narrowness of its review in these federal habeas proceedings. If it were in the place of the BPT, or even that of the state court, the result in this case might well have been different. In these proceedings, however, it is not the Court's task to determine whether "the public safety requires a more lengthy period of incarceration for [Petitioner]." Cal. Penal Code § 3041(b). It is also not the task of this Court to review in the first instance whether the proceedings before the BPT complied with the strictures of the Due Process Clause. That job that belongs to the California courts. See 28 U.S.C. § 2254(b)(1) (requiring a prisoner to exhaust his constitutional claims in state court). Rather, the narrow question presented here is whether it was unreasonable for the California Court of Appeal to determine that there is "some evidence" to support the BPT's denial of parole. Habeas relief is not warranted if the California court's decision was erroneous or incorrect. Rather, that decision "must also be unreasonable." Williams v. Taylor, 529 U.S. 362, 412-13 (2000). Even as to that narrow issue, the Court finds that this case presents a very close question. Ultimately, however, in light of the cases that have applied the Due Process Clause in the context of parole proceedings under AEDPA, this Court cannot conclude that Petitioner has demonstrated his entitlement to habeas relief at this time. See Irons, 479 F.3d at 665; Sass, 461 F.3d at 1128-29; Biggs, 334 F.3d at 914.

In sum, Petitioner's plea agreement does not provide a basis for habeas relief because there is inadequate evidence to support Petitioner's view that the plea entailed a guarantee that he would receive parole after 10 years of discipline-free imprisonment. Further, it was not unreasonable for the California Court of Appeal to conclude that the district attorney's conduct at the parole hearing did not constitute a violation of the plea agreement--a violation that, in any event, would not entitle Petitioner to habeas relief in this Court. Finally,

16

although several of the reasons given by the BPT for denying parole are unsupported by the record, the Court nonetheless concludes that "some evidence" supports the BPT's decision, and therefore that the BPT's ruling does not violate the Due Process Clause.  Accordingly, the petition is hereby DENIED.

**IT IS SO ORDERED.**

Dated: July 24, 2007

CHARLES  R. BREYER
UNITED STATES DISTRICT JUDGE